1

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  STEPHEN WALLACE,                    No. CIV S-09-1062-CMK

12              Plaintiff,

13       vs.                           <u>MEMORANDUM OPINION AND ORDER</u>

14  COMMISSIONER OF SOCIAL
    SECURITY,
15
                Defendant.
16  _____/

17              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19  Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

20  judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

21  before the court are plaintiff's motion for summary judgment (Doc. 15) and defendant's cross-

22  motion for summary judgment (Doc. 16) and amended cross-motion for summary judgment

23  (Doc. 19).

24                      **I.  PROCEDURAL HISTORY**

25              Plaintiff applied for social security benefits protectively on March 29, 2006.  In

26  the application, plaintiff claims his disability began on March 29, 2005.  Plaintiff claims his

disability is caused by a combination of heart problems, heart attack, blood clot, sarcoidosis, and reflective sympathetic dystrophy (RSD).  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on April 10, 2008, before Administrative Law Judge ("ALJ") James M. Mitchell.  In a September 22, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act though December 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since March 29, 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.  The claimant has the following severe impairment: coronary artery disease with a history of anterior myocardial infarction, a history of pulmonary embolism, a history of sarcoidosis and reflex sympathetic dystrophy of the right upper extremity (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional non-exertional restrictions: diminished but correctable vision, slightly limited overhead, side and front reaching with the right dominant features, slightly limited fine and gross manipulative ability in the right dominant features, slightly limited with simple and routine tasks, requires occasional supervision, and has slight to moderate pain.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on August 5, 1961 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"

whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from March 29, 2005 through the date of this decision (20 CFR 404.1520(g)).

After the Appeals Council declined review on March 19, 2009, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

A.   Treating Records

Ambulatory Surgery Center of Stockton

Following a work related injury on April 6, 2002, plaintiff began treatment with Dr. Jeff Jones at the Ambulatory Surgery Center.  On October 14, 2002, Dr. Jones performed a right stellate ganglion block.  After the procedure, plaintiff had a marked decrease in pain. Plaintiff still had persistent numbness in his hand.   At that time due to the numbness, Dr. Jones was uncertain if plaintiff's condition was a pure brachial plexopathy, pure chronic regional pain syndrome, or a combination of both.

On October 28, 2002, plaintiff underwent an interscalene brachial plexus block. After this procedure performed by Dr. Jones, plaintiff had a complete absence of pain and improvement in the numbness in his hand.  Dr. Jones performed another right stellate ganglion block on plaintiff on November 8, 2002, which resulted in evidence of a sympathetic block of plaintiff's pain.

In 2003 plaintiff saw Dr. Jones for another series of right stellate ganglion blocks on January 6, January 13, January 20 and January 27 in an attempt to control his pain.

/ / /

3

<u>Lodi Memorial Hospital</u>

On January 29, 2003, plaintiff was admitted to Lodi Memorial Hospital by his general physician, Dr. David Duncan, on an emergency basis due to anterior pleuritic chest pain, shortness of breath, dyspnea on exertion, palpitations, periods of near syncope and faintness. (244-47). A CT scan of plaintiff's lung revealed a bilateral pulmonary emboli.

Dr. Duncan referred plaintiff to Dr. Robert Monie for evaluation at the hospital on January 30, 2003, for assessment of pulmonary emboli. Dr. Monie ordered more tests in an attempt to determine if the series of injections had caused the event. (CAR 256-58).

Dr. Roy Kaku also consulted on plaintiff's condition on January 30, 2003. Dr. Kaku determined that plaintiff had recently suffered an apical myocardial infarction in addition to the bilateral pulmonary emboli and a right brachioplexopathy. (CAR 254). Dr. Kaku opined that plaintiff would require long term Coumadin anticoagulation and suggested adding enteric coated aspirin for his myocardial infarction

While plaintiff was still in the ICU at Lodi Memorial Hospital on January 31, 2003, Dr. Yeh Gong consulted and opined that Plaintiff would have an ongoing risk for another pulmonary embolus which may be severely detrimental to his overall well being. (CAR 248-51).

Dr. John Chin concluded in an Echocardiography Report dated February 3, 2003, that the study was abnormal demonstrating left ventricular dysfunction with apical and septal dyskinesis with evidence of apical thrombus which appears to be stable. (CAR 260). Plaintiff was discharged from the hospital by Dr. Chin on February 5, 2003, with prescriptions for Coumadin, Ecotrin therapy, Altace, Pravachol and Toprol.

On February 7, 2003, Plaintiff was taken by ambulance to the emergency room after his wife thought he had suffered a seizure. Dr. Richard Buys assessed plaintiff with an altered mental state, seizure versus syncope. (CAR 236).

Plaintiff was again admitted to the hospital by Dr. Duncan on February 8, 2003, with diagnoses of pre-syncope leading to a near syncope episode, recent anterior myocardial

4

1  infarction with left ventricular clot, left deep venous thrombosis (DVT), and chronic reflex

2  sympathetic dystrophy of the right arm with chronic pain complex.  (CAR 238).

3         On March 22, 2003, Plaintiff had a venous doppler sonogram of his right leg due

4  to swelling and tenderness, and to rule out DVT.  The examination showed normal deep venous

5  flow; the impression was no sonographic evidence of deep vein thrombophlebitis.  (CAR 454).

6         On March 18, 2003, Plaintiff was brought by his wife to the emergency room with

7  complaints of a right supraorbital headache, heaviness and confusion, numbness in the left arm,

8  chest burning and stinging and, after examination, was admitted by Dr. Duncan.  After

9  undergoing various tests, plaintiff was examined by Elizabeth Hereford, M.D., on March 23,

10  2003, who diagnosed plaintiff with two vessel coronary disease with some less significant

11  disease in the circumflex.  (CAR 219).

12                    Sierra Valley Lung and Sleep Medical Group

13         On October 30, 2003, plaintiff was assessed by Dr. Robert G. Monie with an

14  abnormal CT and PET scan, pulmonary emboli, CAD S/P MI, anticoagulation and right arm

15  injury with brachioplexus injury.  (CAR 284).  A November 13, 2003, CT abdominal scan was

16  normal.  (CAR 286).  In a letter dated December 16, 2003, addressed to Dr. Duncan, Dr. Monie

17  gave plaintiff a diagnosis of sarcoid.  (CAR 282).  A January 19, 2005, chest x-ray was

18  essentially normal.  (CAR 285).  On March 11, 2005, Plaintiff had a whole-body FDG PET scan

19  which found no abnormal activity in his neck, low level activity in the right superolateral chest,

20  but no abnormal uptake in the chest, abdomen or pelvis.  The impression was "Low level uptake

21  anterolaterally in the right superior chest along the pleural surface is non specific and may

22  represent pleural reaction or an inflammatory process."  (CAR 287).  A pulmonary function test

23  completed on March 4, 2005, was normal.  (CAR 310).

24                         Bay Area Pain and Spine

25         The records submitted by H. Darien Behravan, D.O., reveal that plaintiff was

26  evaluated at UCSF Medical Center for pain management on May 14, 2003, and was assessed

with brachial plexus injury as well as complex regional pain syndrome in the right upper extremity. (CAR 375-77). At that time it was noted that he was taking Oxycotin, Coumadin, Altace, Coreg, and Pravachol. (CAR 376). The records reflect that plaintiff was referred to Dr. Behravan as treating physician for pain management in 2003 and continued thereafter. Dr. Behravan referred Plaintiff to the Health Education for Living with Pain (HELP) Program in July 2005.[1]

Plaintiff was evaluated by HELP on August 1, 2005. His physical therapy screening noted Plaintiff's reported limitations at thirty minutes of sitting, forty-five minutes of standing, and one mile of walking. (CAR 347). The mental health screening by HELP noted a diagnosis of pain disorder associated with both psychological factors and a general medical condition, and major depressive disorder, recurrent, mild, without psychotic features. (CAR 344). He was assessed with a Global Assessment of Function (GAF) of 57. Plaintiff then participated in a six week daily pain management program through HELP beginning January 9, 2006. (CAR 319). The discharge summary, dated February 17, 2006, noted he was successful in weaning down his methadone to a great extent, but was unable to totally eliminate it. "He showed no cognitive impairment on the methadone and in fact shows functional improvement on it." (CAR 320). His functional capabilities improved by fifty-percent , and his depression was reduced. It was further noted as to Plaintiff's working ability: "Permanent disability is expected however we defer to the treating physician and/or appropriate medical legal evaluator for further disability rating. . . . In terms of work status, the patient may not return to the usual and customary job and is medically appropriate for vocational rehabilitation within the work preclusion parameters outlined." (CAR 322).

/ / /

/ / /

---

[1]    This treatment appears to be related to Plaintiff's workers' compensation claim for the industrial injuries he sustained to his right shoulder.

1       In a February 22, 2006, Dr. Behravan diagnosed coagulopathy which is severe in

2   nature, and noted Plaintiff described what Dr. Behravan referred to as total body allodynia.

3   (CAR 317-18).

4       Dr. Behravan's examinations of plaintiff on May 1 and June 8, 2006, showed that

5   his condition was unchanged, but was gaining weight on the Lyrica so was discontinuing it.

6   (CAR 605-08).  At the office visit with Dr. Behravan July 12, 2006, Plaintiff's condition was

7   noted as unchanged but that plaintiff was having some right side neck and finger pain and was

8   experiencing numbness in his fingers with some stabbing pain. (CAR 603).

9       At follow-up visits on September 27 and November 1, 2006, plaintiff was having

10  occasional flare up of pain and his condition was noted by Dr. Behravan as unchanged. (CAR

11  595-598).

12      Plaintiff had another follow-up visit on January 22, 2007.  Dr. Behravan noted

13  Plaintiff was doing well on the medications, including methadone (now three times a day),

14  Cymbalta, and Lidoderm.  He was not having any side effects and no breakthrough pain.  (592-

15  93).

16      Plaintiff was also seen by Dr. Behravan for follow up visits on March 1, August 9,

17  and September 13, 2007, and then again on April 3, 2008.  In March 2007, Plaintiff stated he was

18  doing very well, but was having some right shoulder pain and left foot pain.  He was trying to

19  keep his feet up.  Dr. Behravan noted he was taking his medications responsibly without any

20  problem.  (CAR 700-01).  In August 2007, Plaintiff complained of pain over his back.  His

21  medications included Cymbalta, Lidoderm, and Methadone.  Dr. Behravan stated:

22          He is doing the same, he is applying for disability and federal
            disability.  I see no reason why he can not work at least 6 hours a
23          day in a sedentary job.  I believe that he needs to develop more
            active coping skills with respect to his pain, he can use his left
24          hand only, he can not use his right had for typing.  I believe that he
            has had this chronic pain for so long that he has developed chronic
25          pain syndrome and has developed somatoform.  (CAR 698-99).

26  ///

7

1    In September 2007, Dr. Behravan noted Plaintiff was doing the same, continuing

2 to complain of the same symptoms and the pain waxing and waning.  Dr. Behravan noted the

3 same as quoted above.  (CAR 696-97).

4    In April 2008, Plaintiff's symptoms had remained the same with the usual

5 complaints of a plethora of right upper extremity symptoms and discomfort.  Dr. Behravan noted

6 that there is not much in the way of objective findings, but that Plaintiff's complaints were

7 consistent with his diagnosis.  Dr. Behravan again noted his thoughts as quoted above.  (CAR

8 693-94).

9    <u>Elizabeth A. Hereford, M.D.</u>

10    Elizabeth A. Hereford, M.D., first consulted with plaintiff during his

11 hospitalization in March of 2003.  In a Discharge Summary dated March 25, 2003, Dr. Hereford

12 diagnosed plaintiff with left chest pain with infarction excluded; coronary artery disease with

13 previous anterior infarction with apical clot; protein C and S deficiency as well as abnormality

14 with a mutation of the methyl tetrahydrofolate reductase enzyme; previous pulmonary emboli

15 with left deep vein thrombosis; right sympathetic dystrophy; and previous kidney stones. (CAR

16 475).

17    In a February 17, 2004, office visit report, Dr. Herford assessed plaintiff with a

18 previous anterior infarction; hyperlipidemia, and sarcoid (CAR 470).  On June 16, 2004, Dr.

19 Hereford noted Plaintiff was stable from a cardiac standpoint.  (CAR 469).

20    Plaintiff was again seen by Dr. Hereford on November 1, 2004, and her notes

21 indicate previous large anterior infarction; reflux sympathetic dystrophy unchanged; and

22 hyperlipidemia controlled.  (CAR 468).

23    In a report dated February 28, 2006, Dr. Hereford assessed plaintiff with a

24 pervious large anterior infarction and known coronary artery disease, hyperlipidemia, sarcoidosis,

25 and previous pulmonary emboli. (CAR 465).

26 / / /

Plaintiff underwent an Exercise Stress Test on March 15, 2006.  Dr. Hereford concluded that the plaintiff had good functional capacity; chest discomfort with exercise characteristic of ischemia, normal blood pressure response, no arrhythmias; and no evidence of ischemia.  However, it was noted that the test was stopped due to Plaintiff's exhaustion, and he was only able to achieve 84% of his maximum predicted heart rate.  (CAR 191, 464).  A Cardiolite myocardial Persantine SPECT study done the same day showed Plaintiff has persistent left ventricular enlargement seen with an irreversible anteroseptal fixed defect.  (CAR 462.)

On December 1, 2006, Dr. Hereford assessed plaintiff with previous apical infarction and known coronary disease; hyperlipidemia with fairly good control; abnormal clotting problems; sarcoidosis; and chest pains of unclear etiology.  (CAR 592).

Plaintiff had a stress echo on April 27, 2007.  He was able to go for ten minutes and forty-one seconds on the Bruce protocol at a heart rate of 153.  He had some chest discomfort that occurred with respiration, but it did not worsen with exercise.  Dr. Hereford assessment was "No evidence of ischemia is seen.  His exercise tolerance is good."  (CAR 646).  The conclusion of the test was:  1) Average functional capacity.  2) Nonischemic-type chest pain occurred.  3) Normal blood pressure response to exercise.  4) No arrhythmias occurred.  5) No evidence of ischemia with adequate heart rate and workload achieved."  (CAR 647).

An office visit on October 26, 2007, noted plaintiff's regular exercise, pain in his left calf that is chronic but is better if he lifts a leg above his heart.  Dr. Hereford assessed him with previous apical infarction - stable without anginal-like pain, hyperlipidemia with good control although his HDL was still slow, previous sarcoid, and clotting abnormality with previous pulmonary emboli and left superficial femoral vein and popliteal vein DVT, noting the pain in his calf was probably due to venous insufficiency.  He was encouraged to wear support stockings and continue to exercise.  (CAR 645).

Plaintiff was seen by Dr. Hereford again on March 11, 2008.  He reported feeling well, continuing to exercise on the treadmill at least thirty minutes a day and doing yard work.

He noted that if he exercises too much he experiences some pressure in his chest, but had no problems with palpitations, syncope or presyncope.  He also reported that his calf still bothered him, but was unchanged.  Her assessment was previous anterior infarction - stable, hyperlipidemia with good control, and history of clotting abnormality.  (CAR 644).

David Duncan, M.D.

Dr. Duncan appears to be Plaintiff's primary care physician, but has referred Plaintiff out to various specialist for treatment.  Treatment notes from November 22, 2005, note Plaintiff's history of sarcoidosis, protein C deficiency, history of left deep vein thrombosis with bilateral pulmonary embolism and acute anterior myocardial infarction in January of 2003, as well as reflux sympathetic dystrophy and chronic right arm pain.  (CAR 384).  Plaintiff reported excellent exercise tolerance and scuba diving routinely.  Dr. Duncan assessed Plaintiff's clinical problems as very stable, and re-authorized follow up with Dr. Hereford.

An office visit report from March 22, 2006, reflects Plaintiff's history of reflex sympathetic dystrophy of the right arm, coagulation disorder with protein S and C deficiency, spontaneous left deep vein thrombosis, bilateral pulmonary embolism, acute anterior myocardial infarction with left ventricle clot in January 2003, diffuse coronary artery disease, and Stage II sarcoidosis.  (CAR 493).   Dr. Duncan noted Plaintiff was stable on chronic Coumadin therapy.

Plaintiff had a follow-up visit on September 20, 2006, relating to the same ailments.  Dr. Duncan noted Plaintiff's methadone dose was down to 7.5 mg from 10 mg once daily, and that his clinical problems were stable.  He also provided Plaintiff with a jury exclusion due to chronic pain (CAR 495).

On March 19, 2007, Plaintiff was seen again by Dr. Duncan for routine follow up. At that time, Plaintiff reported feeling well, no chest pain or shortness of breath and only an occasional cough.  He also reported he was told the sarcoidosis was essentially in remission. Plaintiff's medications were unchanged except his methadone had increased to 10 mg three time a day.  (CAR 938).

John P. Connolly, M.D.

Dr. Duncan refereed Plaintiff to Dr. Connolly for follow up with his lung problems.  On November 16, 2006, Dr. Connolly examined Plaintiff and found he had a very complex story of hypercoagulability, but that he was on appropriate anticoagulation with benefit. Dr. Connolly noted Plaintiff's past pulmonary function test, chest film, and his exam and oxygenation were all normal.

Dr. Connolly performed a pulmonary function test on December 11, 2006.  The study showed normal baseline spirometry without a bronchodilator effect.  However, the lung volumes suggested air trapping consistent with obstruction, and noted the possibility of pulmonary vascular disease.  (CAR 511).  Plaintiff also had a chest CT performed on December 26, 2006, which showed no evidence of a diffuse infiltrative process nor any gross evidence of mediastinal adenopathy.  There was some minimal focal interstitial infiltrate and subpleural cyst formation seen anterolaterally in the right upper lobe.  It was thought to relate to a pervious focus of pneumonia but not likely related to systemic disease.  (CAR 625).

In a letter to Dr. Duncan on January 18, 2007, Dr. Connolly noted Plaintiff was doing well and several tests were normal, including ACE, CDC, and renal function.  In addition, he noted Plaintiff's pulmonary function tests had showed improved spirometry since March 2005, and that Plaintiff was struggling with his RSD more than any other issue.  (CAR 624).

B.    Consultative Examination Records

Physical Residual Functional Capacity Assessment

This RFC was completed by Dr. Jansen on August 7, 2006.  Plaintiff's exertional limitations were noted as occasionally and frequently lifting ten pounds; standing or walking at least two hours in an eight-hour workday; sitting for about six hours in an eight-hour workday, but must periodically alternate sitting and standing to relieve pain or discomfort; and pushing or pulling was limited in lower extremities.  As for the alternating between sitting and standing limitation, Dr. Jansen stated:

1    See CR/DEA GUI.  ADL's by inference considered.  Complicated
     HX of hypercoagulable state considered.  CAD considered.
2    Because of hypercoagulable state and threat of DVT, pedal work
     precluded.  For the same reasons, sit no longer than one hour at a
3    time; then < 2 min stretch break.  Stand no longer than 2 hours/day,
     and no more than 30 mins at a time; then < 2 min sit break.  (CAR
4    539).

5         Dr. Jansen also noted all postural limitations were at occasional, except

6    ladder/rope/scaffolds which was noted at never.  No manipulative limitations were noted, nor

7    were any visual or communicative limitations.  The only environmental limitation was exposure

8    to hazards due to Coumadin treatment.  (CAR 542).

9                    Psychological Evaluation

10        Plaintiff participated in a psychological evaluation with David C. Richwerger,

11   EdD, on September 28, 2006.  Dr. Richwerger administered a number of tests and reviewed

12   Plaintiff's prior records.  Plaintiff provided his past history, and stated that he does household

13   chores, errands, shopping, driving, dressing, bathing, and cooking as well as gardening and

14   walking, which he did on a daily basis.  Upon examination, Dr. Richwerger noted Plaintiff's

15   verbal response time was within normal limits, he had no articulation problems, his thought

16   processes were clear, rational, occasionally detailed.  His understanding of instructions was

17   within normal limits for simple tasks, but he had occasional difficulty with verbal memory tasks.

18   He scored in the fourteenth percentile on memory tasks, the thirteenth percentile on concentration

19   and attention tasks.  Plaintiff scored in the superior range on the Bender-Gestalt-II visual-motor

20   skills test, in the low range on Trails A, but the normal limits on Trails B.  Plaintiff was unable to

21   use his right hand well enough to complete the Digit Symbol test, but prorated he scored within

22   the normal limits on the WAIS-III.  Plaintiff had some difficulties on the Wechsler Memory

23   Scales, III, but the reason was unclear.  Plaintiff reported that he had noted the problems since his

24   heart attack, and that medication side effects may be apparent.  (CAR 546-50).

25   / / /

26   / / /

Dr. Richwerger's diagnostic impression was

> Depressive disorder, not elsewhere specified, mild-
> to-moderate, in remission at this time on
> medications.  Cognitive disorder, not elsewhere
> specified, very mild, possibly secondary to
> medication side effects or possibly to heart attack,
> as discussed by the clamant.  (CAR 550).

He assessed Plaintiff with a GAF of 65.  Dr. Richwerger's functional assessment of Plaintiff was that Plaintiff had a slight to moderate impairment in his ability to perform detailed and complex tasks; a slight impairment in his ability to perform work activities on a consistent basis, understand and accept instructions from supervisors, and deal with the usual stresses encountered in competitive work; but no impairment in his ability to perform simple and repetitive tasks, perform work activities without special supervision, complete a normal workday or workweek, interact with coworkers and the public, or maintain regular attendance.  (CAR 551).

                    Mental Residual Functional Capacity Assessment

A Mental RFC assessment was completed on October 20, 2006, by Y.C. McDowell.  The only limitations noted were a moderate limitation for understanding and remembering detailed instructions and the ability to carry out detailed instructions.  No other significant limitations were noted.  (CAR 565-567).

          C.     Hearing Testimony

          Plaintiff's Testimony

Plaintiff testified at the time of the hearing he was 46 years old, had a Bachelor of Science degree, from Fresno State University, in Agricultural Business with a minor in Economics.  His family was in the farming business.  He stopped working in March 2005.  He has pain in the right extremities.  His last job was working as a manager for an automotive/ manufacturing company, wherein he worked in production control.  He worked as a manager of some sort from 1994 to 2005.  Prior to that he worked in farming.  He testified that he was unable to return to those jobs due to pain in his right arm, right side, right side of face, and right chest.

1   He also has pain in his left leg.  He quit his employment in March 2005, when he and his boss

2   agreed he was no longer capable of being an employee at the company due to his problems.

3         Plaintiff stated he wakes up in the morning between 7:00 and 10:00, and goes to

4   bed at night between 7:30 and 9:30.  He lives with his wife and two children, aged twenty and

5   sixteen.  His wife does the cooking, but he will usually make two meals a day, such as a

6   sandwiches, toast or cereal.  He washes dishes on an average of five times a week.  He does not

7   mop the floors or clean the bathroom, but he does sweep or vacuum once a week, and dusts

8   maybe once a month.  He helps with the laundry twice a week, and does shopping either by

9   himself or with others maybe once or twice a week.  He does not make the bed or change the

10   sheets.  He spends less than an hour a week on the computer, and watches television about four

11   hours a day.  He only reads the comics in the newspaper, which takes about five minutes.  He

12   listens to the radio about five hours a day.  His mother comes over once a week for dinner.  His

13   wife handles the finances.  He exercises twenty minutes a day on the treadmill, then twenty to

14   thirty minutes on the floor doing stretching and exercising, and on a gym ball with a two-pound

15   foam-padded weight.  He talks on the phone maybe an hour a day.  He also spends about fifteen

16   minutes walking outside.  He no longer attends church; he cannot do the sitting and standing in

17   the pews anymore because his leg goes to sleep and he gets lightheaded when he stands up.  He

18   likes to mow the yard on his riding mower, which he does in ten to fifteen minute intervals, once

19   a week.  It takes him maybe 30 minutes to mow the whole yard, but he usually does it with two to

20   three breaks.  He leaves the house three times a week.  He also drives three times a week, about

21   five miles on average.  He goes to the store and doctors' appointments.  He drove himself to the

22   hearing.

23         Including naps, he sleeps about ten hours a day.  He takes medication three times

24   a day.  He sees his pain management doctor the most often, Dr. Behravan, who he sees monthly,

25   and has been seeing him for about five years or more.  He was advised by Dr. Behravan not to do

26   anything that causes more pain.  In the last twelve months, Plaintiff has not been to the

1  emergency room or stayed overnight as an in-patient in a hospital.  He is not seeing any mental

2  health professional.

3          Plaintiff stated he does not attend any meetings on a regular basis.  He can stand

4  maybe 15 minutes, sit maybe ten to fifteen minutes, and walks about twenty minutes going

5  almost eight tenths of a mile.  He is unable to reach out in front of him with his right arm without

6  extreme pain.  He also experiences pain when reaching to the side with his right hand.  "The pain

7  starts with my right fingertips, emanating through my entire hand, all the way up my arm, into

8  my chest, across my shoulder . . . and up into my face."  (CAR 42).  He is able to reach overhead

9  with his left arm, but not his right.  Nor can he hold onto things, or pick things up, with his right

10  hand, because he does not have the sensation to feel how much pressure he has in his hand.  He

11  feels buzzing, burning sensation in his hand.  He can pick things up off the table and hold them

12  with his left hand.  He cannot feel the difference between hot and cold water with is right hand,

13  but can with his left.  He has difficulty holding a pen to write a check, which he can sign but with

14  difficulty and extreme pain.  He is unable to do prolonged writing with either hand; he is not left-

15  handed.  He has difficulty turning his head to the right.  He also has difficulty dialing the phone

16  with is right hand, but not with his left.  He uses the telephone one to three times a day.  He

17  wears glasses all the time.

18          Plaintiff further testified that his main complaint "is my right arm, hands, side

19  pain, and my fatigue and confusion . . . ."  (CAR 46).  He hurts in his right hand, right forearm,

20  right elbow, right bicep, shoulder, up right side of his neck, right side of his face just below the

21  ear, across his back, his left leg on the left calf area, and his chest (it hurts to breathe).  On an

22  average day, he experiences sharp, dull, burning, throbbing, shooting, stabbing, numbness,

23  tingling, and achy pain.  The pain is moderate to severe, and it is continuous.  It is worse in the

24  morning, and is worse with sitting, standing, stooping and reaching.  It is better when he reclines,

25  elevating his feet and legs.  He is able to dress and bathe himself, but with difficulty.  His

26  medications help with the pain, but have lots of side effects.

1    Upon questioning by his attorney, Plaintiff testified that he lies down during the

2    day because he gets tired and a little dizzy.  He lies down in the afternoon for less than an hour,

3    but sometimes falls asleep for a couple of hours.  He also lies down after dinner, again

4    sometimes for about twenty minutes, sometimes for a few hours, sometimes for the entire night.

5    He had a year and a half of physical therapy for the pain in his right side, which helped him be

6    able to do more, but the pain increased once the physical therapy was done.  He received nerve

7    blocks to try and relieve the pain, which did not work.  He had a total of seven nerve blocks, and

8    a heart attack following the fourth one in January 2003.  He takes methadone and Cymbalta for

9    his pain, which causes several side effects including difficulty speaking, remembering and

10   comprehending what people say.

11             Medical Expert Testimony

12   Paul J. Grodan, M.D., testified as a medical expert at the hearing.  He stated he is

13   an internist and cardiologist.  Dr. Grodan testified that from an internal medicine perspective, not

14   psychological, Plaintiff did not meet the social security listings.[2]  Dr. Grodan opined Plaintiff was

15   capable of performing light work, based on Plaintiff's performance on a treadmill test.  As to

16   sedentary work, he opined Plaintiff would also be capable of sedentary work, but there was a

17   question of residual pain syndrom, the use of his right arm, and a psychological issue.  Upon

18   questioning by Plaintiff's attorney, Dr. Grodan testified that as the occlusion of Plaintiff's left

19   arterial descending artery, "as long as he doesn't have ischemia by objective measures, it would

20   not affect him."  (CAR 18).  If, however, he had impaired ejection fraction, it may affect the

21   fatigue level.  However, based on Plaintiff's performance, almost eleven minutes on the

22   treadmill, he should not be fatigued due to his heart.  Dr. Grodan also testified that, with the

23   exception of the sleeping pills Plaintiff was taking, none of his other medications should cause

24   fatigue.  The list of medications also would not change his opinion on Plaintiff's ability to

25

26        [2]        Some of Dr. Grodan's testimony was noted as inaudible in the transcript.

1  perform light or sedentary work.  He further opined that given the low dosage of his medications,

2  he should not have any side effects.

3  Vocational Expert Testimony

4  George Meyers testified as the vocational expert (VE).  Mr. Meyers testified as to

5  Plaintiff's past positions, indicating he would have transferability to other light or sedentary jobs,

6  but not semiskilled jobs.  The ALJ then asked the following hypotheticals:

7  (1)  Assume an individual 46 years of age, high school education,
   four years of college, Bachelor's Degree, work history as
8  described, and the following restrictions:  He can lift, push, pull 20
   pounds occasionally, 10 frequently; walk, stand frequently; sit,
9  stoop, or bend occasionally.  Could one return to any of the past
   relevant work?

10

11  The VE responded that such an individual "could return to the retail store

12  manager and production manager and irrigation manager as performed in the national economy."

13  (CAR 54).

14  (2)  Assume . . . these nonexertionals:  He's unlimited in attention,
   concentration, understanding and memory; vision diminished but
15  correctable; hearing unlimited; he is slightly limited in overhead,
   side, and front reach with the right dominant feature, slightly being
16  six hours or less per shift; fine manipulative - - fine and gross
   manipulative ability are slightly limited with respect to the right
17  dominant feature; he is slightly limited in the ability to do SRT;
   environmentally no restrictions; unlimited contact with public;
18  occasional supervision; slight to moderate pain.  Could one return
   to past relevant work in the manager jobs.

19

20  The VE responded negatively; "100 percent erosion of the semiskilled jobs, and of

   the unskilled jobs, 50 percent erosion."  (CAR 55).

21

22  (2a)  Assume . . . that he is going to be moderately limited in both
   overhead, side, and front reach with the right dominate feature.  Of
23  the previously mentioned, what percent?"

   The VE responded one hundred percent.  (CAR 55).

24

25  (3)  Assume . . . a sedentary RFC.  Assume an individual 50 - - 46
   years of age, high school education, four years of college, a
26  Bachelor's Degree, work history as described, and the following
   restrictions:  He can lift, push, pull ten pounds occasionally, five

17

1   frequently; walk, stand, stoop, bend, occasionally; sit frequently.
    Could one return to any of the past relevant work?
2

3   The VE responded negatively, but that there were other possible jobs available.

4   The VE then provided two sedentary, semiskilled jobs (invoice control clerk and timekeeper) as

5   well as two sedentary, unskilled positions (order clerk and charge account clerk).  (CAR 55-56)

6   (4)  Assume . . . these nonexertionals:  He is unlimited in attention,
    concentration, understanding, and memory; vision diminished but
7   correctable; hearing unlimited; he is slightly limited in overhead,
    side, and front reach with the right dominant feature; slightly
8   limited in both fine and gross manipulative ability with the right
    dominant feature; he is slightly limited in the ability of SRT; he is
9   environmentally no restrictions; unlimited contact with public;
    occasional supervision; pain slight to moderate.  Of the previously
10  mentioned, with percent erosion?

11  The VE responded "Eighty percent."  (CAR 56-57).

12  (4a)  Assume . . . that he is going to be moderately limited in
    overhead, side, and front reach with the right dominate feature.  Of
13  the previously mentioned, what percent?

14  The VE stated "One hundred percent."  (CAR 57).

15  Plaintiff's attorney then proposed hypotheticals to the VE.  With the added

16  limitations of "moderate difficulty carrying out detailed instructions" such a person could not

17  return to the past relevant work.  Adding the limitation of "moderate difficulty in maintaining

18  concentration, persistence, and pace," such an individual would not be able to perform any jobs

19  in the national economy.  (CAR 57).  With the change to "a slight to moderate impairment in the

20  ability to perform detailed instructions and complex tasks," such a person would not be able to

21  return to his past relevant work.  (CAR 57-58).

22  Plaintiff's attorney then posed a new hypothetical,

23  with this person being able to lift ten pounds occasionally, ten
    pounds frequently; could stand and walk in combination for two
24  hours in an eight-hour day; would be able to sit six hours in an
    eight-hour day, but would have to alternate sitting and standing; he
25  would be limited in his lower left extremity to - - in pushing and
    pulling; he could sit less than one hour at a time, then he would
26  have to have a stretch break for less than two minutes; stand no

18

1   longer than two hours in an eight-hour day; and no longer . . . than
    30 minutes at a time with a less than two . . . minute break.
2

3          The VE stated such a person could not return to Plaintiff's past relevant work.  In

4   addition, there are no jobs in the national economy that this person could do.  (CAR 58).

5          As another hypothetical, Plaintiff attorney asked that if this person could lift ten

6   pounds, sit for 30 minutes, stand for 45 minutes, is there any work in the national economy this

7   person could do, to which the VE responded negatively.

8          Plaintiff's attorney's last hypothetical was a person who "could work six hours in

9   an eight-hour day in a sedentary or light duty job; he could use his left arm only, and cannot use

10  his right arm or hand."  To which the VE responded such a person could not do any work in the

11  national economy or return to his past relevant work.  (CAR 59).

12                              **III.  STANDARD OF REVIEW**

13         The court reviews the Commissioner's final decision to determine whether it is:

14  (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

15  whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

16  more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

17  (9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a

18  conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including

19  both the evidence that supports and detracts from the Commissioner's conclusion, must be

20  considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v.

21  Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

22  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

23  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

24  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

25  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

26  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

                                          19

which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

Plaintiff argues the ALJ erred in several ways: (1) the ALJ improperly discredited Plaintiff; (2) the ALJ improperly evaluated the medical opinions; (3) the ALJ failed to properly consider third party testimony; and (4) the ALJ failed to consider Plaintiff's medications.

### A.    PLAINTIFF'S CREDIBILITY

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v. Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce

1
2
3

> objective medical evidence of the causal relationship between the
> medically determinable impairment and the symptom.  By requiring that
> the medical impairment "could reasonably be expected to produce" pain or
> another symptom, the Cotton test requires only that the causal relationship
> be a reasonable inference, not a medically proven phenomenon.

4   80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799

5   F.2d 1403 (9th Cir. 1986)).

6          The Commissioner may, however, consider the nature of the symptoms alleged,

7   including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

8   947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

9   claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

10  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

11  prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

12  physician and third-party testimony about the nature, severity, and effect of symptoms.  See

13  Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

14  claimant cooperated during physical examinations or provided conflicting statements concerning

15  drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

16  claimant testifies as to symptoms greater than would normally be produced by a given

17  impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

18  Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

19         Plaintiff argues the ALJ rejected his testimony for impermissible reasons, in that

20  the ALJ mischaracterized and ignored portions of  his testimony.  He takes issue with the ALJ's

21  discussion of his daily activities, and the difficulties he has therewith, as well as the ALJ's

22  treatment of his subjective complaints of pain.

23         As to Plaintiff's statements regarding pain, the ALJ stated:

24
25
26

> The undersigned has considered the claimant's statements and
> testimony regarding his alleged inability to work due to pain as
> well as the written statements of his wife which detailed his
> symptoms and medical care and her claims that he is unemployable
> (Exhibits 3E and 25F).  While the undersigned acknowledges that

the claimant has various medical conditions which can reasonably be expected to significantly reduce his functional abilities, the objective medical evidence does not support a finding of disability. . . .

In January 2007, the claimant reported to Dr. Darien Behravan, his treating physician at Bay Area Pain and Spine Institute, that he was doing well and had experienced no breakthrough pain with his regimen of medications (Methadone, Cymbalta, and Lidoderm) (Exhibit 15F).  Despite allegations by the claimant and his wife that he is unable to work or get hired as a result of his impairments, Dr. Behravan's treatment notes indicate that the claimant had an extremely positive experience in his pain management program and had even been offered a job to work there (Exhibit 15F/9). Moreover, Dr. Behravan stated in April 2008 that he saw no reason why the claimant could not perform up to 6 hours of sedentary work or light duty work with restrictions upon his right arm.  He further opined that the claimant needed to develop more active coping skills with respect to his pain (Exhibit 27F).  (CAR 73).

As to Plaintiff's daily activities, the ALJ stated:

The claimant's self-reported activities of daily living also suggest an ability to sustain some level of work activity.  He has stated that in a typical day he engages in household chores, errands, shopping, driving, dressing, bathing, cooking, and gardening (Exhibit 10F). The claimant stated that he can walk 1 mile in 20 minutes, after which he must stop to rest due to pain and weakness.  (Exhibit 3E). In March 2008, the claimant reported to his physician that he exercises on a treadmill for at least 30 minutes a day and also engages in yard-work.  He did not report problems with palpitations, syncope, or pre-syncope (Exhibit 21F).

The claimant testified he prepares meals two times a day; washes dishes 5 times a week; sweeps or vacuums once a week; dusts once a month; does or helps with laundry two times a week; goes shopping either by himself or [with] another two times a week; exercises 20 minutes a day; mows the grass once a week for about 30 minutes; and drives 3 times a week to the store or doctors. (CAR 73-74).

Plaintiff argues these statements do not accurately portray his testimony or level of activity as the ALJ failed to explain that when he mows, he does so with a riding lawn mower and takes breaks during that activity, ignored that Plaintiff stated after walking he breaths fast, trying to catch his breath and has weakness in his legs and arm.  In addition, he argues that the ALJ ignored the record wherein Plaintiff stated while doing household chores he has to stop

1   every thirty minutes and rest for twenty minutes because he gets weak and experiences pain.  He

2   also argues the ALJ ignored his subjective complaints, including numbness, pain, weakness, and

3   tingling in his hands, arms, back, neck, feet and legs.  Finally, he argues his pain complaints are

4   supported by substantial medical evidence which the ALJ ignored, including Dr. Behravan, Dr.

5   Giacomo, and the State Agency findings, and the ALJ failed to support his findings by specific,

6   cogent reasons.

7            In response, Defendant argues the ALJ properly evaluated Plaintiff's credibility.

8   Specifically, that the ALJ relied on proper analysis utilizing more than just the lack of objective

9   medical evidence to sustain his credibility findings.  In addition to the lack of objective medical

10  evidence, Defendant argues the ALJ properly noted Plaintiff's improvement following treatment,

11  the successful pain management and lack of breakthrough pain, the opinion of Plaintiff's treating

12  physician that he could perform sedentary work, his ability to exercise, and his self-reported

13  activities of daily living.

14           The undersigned finds the ALJ sufficiently supported his credibility findings.

15  While Plaintiff argues the ALJ misrepresented his abilities regarding his exercise and daily living

16  activities, the court is not persuaded by that argument.  As set forth above, Plaintiff testified

17  essentially as the ALJ reported.  Plaintiff points to his daily activities questionnaire, which he

18  completed in May 2006, to support his argument that the ALJ skewed the evidence.  In the

19  questionnaire, Plaintiff indicates that after walking a mile in twenty minutes, he is out of breath

20  and has weakness in his legs and pain in his arm.  In addition, he indicates he can lift up to

21  twenty-five pounds occasionally, suffers from fatigue, has to take breaks from housework every

22  thirty minutes, and has to pace himself in all of his tasks.  Contrary to Plaintiff's argument, the

23  ALJ did acknowledge his limitations, including that after he walks he must rest due to pain and

24  weakness.  In addition, at the hearing in April 2008, Plaintiff did not put the same limitations on

25  his abilities to complete housework.

26  / / /

1       The court finds the ALJ's credibility determination was supported by the record as

2   a whole.  The ALJ did not rely solely on the lack of objective medical evidence to support his

3   finding, nor can the court find that he misconstrued or ignored supportive relative evidence.

4   While the ALJ's interpretation of Plaintiff's testimony may not be the only reasonable one, it is

5   still a reasonable interpretation and is supported by substantial evidence.  Providing the ALJ's

6   decision with the proper deference, the court finds the ALJ provided clear and convincing

7   reasons supported by substantial evidence.

8                    **B.     THIRD PARTY TESTIMONY**

9       In determining whether a claimant is disabled, an ALJ generally must consider lay

10  witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

11  919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

12  testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

13  evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

14  F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

15  of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

16  919.

17      As set forth above, the ALJ discounted not only Plaintiff's testimony, but also his

18  wife's statements. Therefore, the ALJ did not disregard the statements without comment, but

19  rather specifically stated he considered the statements.  However, the ALJ found those

20  statements, as well as Plaintiff's, to be contradicted by other evidence as set forth above, and

21  specifically found the statements that Plaintiff is unable to get hired unsupported as Dr. Behravan

22  stated in treatment notes that Plaintiff had been offered a job with the pain management program.

23  The undersigned therefore finds the ALJ did give reasons for discounting Plaintiff's wife's

24  statements.  Additionally, the undersigned finds that even if the reasons provided were not

25  sufficiently germane to Mrs. Wallace's statements, there is substantial evidence in the record to

26  support the ALJ's decion.

24

C.    MEDICAL OPINIONS

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

1    conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

2    1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

3    see also Magallanes, 881 F.2d at 751.

4               Here, Plaintiff claims the ALJ erred in his treatment of the medical opinions in the

5    record in three ways.  First, Plaintiff argues the ALJ ignored the treating physician's findings.

6    Second, that the ALJ ignored a psychological consultative examiner's opinion.  Finally, that the

7    ALJ failed to consider the State Agency findings.

8               As to his treating physician's findings, Plaintiff contends that the ALJ failed to

9    take into consideration his treating physician's diagnosis of peripheral autonomic neuropathy and

10   pain diagnosis, as well as the limitations Dr. Behravan put on his use of right hand.  Specifically,

11   Plaintiff argues that Dr. Behravan opined that Plaintiff could only use his left hand, and had

12   absolutely no fine manipulation ability in his right hand.

13              In response, Defendant argues the ALJ properly considered Dr. Behravan's

14   opinion, and the limitations found were consistent with Dr. Behravan's opinion that Plaintiff was

15   unable to use his right hand for typing.  In addition, the ALJ accounted for Plaintiff's pain

16   diagnosis in finding Plaintiff had slight to moderate pain and limited him to sedentary exertion.

17   Defendant also argues that Dr. Behravan did not opine that Plaintiff had complete limitation on

18   fine manipulation with his right had, but rather a limitation only in his ability to type.

19              The undersigned agrees with the Defendant's argument.  Dr. Behravan stated

20   several times in the record that "I see no reason why he can not work at least 6 hours a day in a

21   sedentary job or light duty, I believe that he needs to develop more coping skills with respect to

22   his pain, he can use his left hand only, he can not use his right hand for typing." (CAR 694, 696-

23   97, 698).   Such a statement does not support Plaintiff's argument that he has the complete

24   inability to use his right hand for any fine manipulation.  The ALJ's finding that he has some

25   limited ability in the use of is right hand for fine manipulation is consistent with Dr. Behravan's

26   statement.  As Defendant points out, the ALJ's limitation as to fine manipulation was also

1  supported by the State agency physician, who did not impose any manipulative limitations.

2  Therefore, Plaintiff's argument that the ALJ failed to credit Dr. Behravan's opinion is

3  unpersuasive.

4         Similarly, the undersigned finds no support for Plaintiff's argument that the ALJ

5  failed to properly credit Dr. Behravan's diagnosis as to Plaintiff's pain.  The ALJ included in the

6  RFC the additional limitation that Plaintiff experiences slight to moderate pain.  While this

7  limitation may not be as extensive as Plaintiff argues it should be, it is supported by substantial

8  evidence, including Dr. Behravan's treatment notes.  Specifically, Dr. Behravan noted several

9  times that Plaintiff was doing well with his pain management, and not experiencing breakthrough

10 pain.  (CAR 593).  In addition, as the ALJ noted, Plaintiff had completed a pain management

11 program, wherein he was successful in coping with his pain, and he was able to decrease the

12 amount of pain medication he was taking.  (CAR 320, 495).  Therefore, the court finds the ALJ

13 properly considered and credited Plaintiff's treating physician's opinion, and the limitations the

14 ALJ found were properly supported by the record.

15        Second, Plaintiff argues the ALJ erred by ignoring a psychological consultative

16 examiner's opinion.  Plaintiff contends the ALJ failed to take into consideration an older

17 psychological examination, from August 2005, wherein the examiner found Plaintiff was

18 suffering from depression, chronic pain, and assessed him with a GAF of 57.  The ALJ failed to

19 provide any reasons for rejecting such an opinion which supported Plaintiff's psychological

20 difficulties.

21        Defendant responded that the ALJ did not err, and properly noted Plaintiff's short

22 history of depression for which he received treatment and was now in remission.  In addition, the

23 ALJ was not required to take into consideration a GAF score, which is intended to be used in

24 make treatment decisions not as a mechanism to determine a disability.

25 / / /

26 / / /

1    The ALJ stated in his opinion:

2    As a result of his physical impairments, the claimant apparently
     began to experience problems with depression.  He did not receive
3    formal psychiatric care, although he informed the psychological
     consultative examiner in September 2006 that after he was
4    prescribed Cymbalta, he was no longer depressed.  The claimant
     was diagnosed with depressive disorder in remission and given a
5    Global Assessment Functioning score of 65 by the consultative
     examiner (Exhibit 10F).  Although the claimant did have a short
6    history of depression, the evidence fails to establish any
     longitudinal treatment.  Moreover, it appears that with medication
7    treatment as well as some coping therapy provided by his pain
     management team, the claimant's depression had entered
8    remission.  As such, there is no evidence that his psychiatric
     problems can be expected to result in no more than "mild" mental
9    functioning restrictions; therefore, his depression is not a severe
     impairment under the regulations.  (CAR 72).

10

11   Contrary to Plaintiff's argument, the ALJ took into consideration the prior

12   diagnosis of depression.  While he did not specifically name the prior consulting examiner, or

13   specifically refer to the 2005 examination, he acknowledged that Plaintiff had previously been

14   diagnosed with depression, but that based on the current examination appeared to be in

15   remission.  The court notes that the psychological examination Plaintiff argues was ignored

16   occurred prior to his attendance in a pain management program.  In addition, the examiner noted

17   that his distress was caused by his inability to manage his pain.  Plaintiff then participated in the

18   pain management program, which was reported as very successful.  It therefore stands to reason

19   that his psychological condition would have improved, as the ALJ stated and as the later

20   psychological examiner found.  Therefore, there is sufficient evidence in the record to support the

21   ALJ's determination.  The undersigned finds no error in the ALJ's treatment of the psychological

22   examination records, and that the ALJ sufficiently addressed the conflicting reports even without

23   referring to the specifics.  See Magallanes, 881 F.2d at 755.

24   Finally, Plaintiff argues that the ALJ failed to take into consideration the finding

25   that he is limited in his ability to sit as evidenced by the State agency physician.  Specifically,

26   the ALJ credited both Plaintiff's treating physician, Dr. Behravan, and the State agency physician

28

1   in determining Plaintiff's limitations.  However, the ALJ failed to include the State agency

2   physician's opinion that he is unable to sit for longer than an hour without a two minute stretch

3   break, and is not able to stand for longer than thirty minutes at a time without a two minute sit

4   break, and no more than two hours a day total.  Defendant responds that the ALJ properly relied

5   on the treating physician's report, which was supported by the record.

6           The error as the court sees it stems more from the ALJ's complete failure to

7   address Plaintiff's leg condition.  Plaintiff was diagnosed with deep venous thrombosis (DVT),

8   as well as hypercoagulability, both indicating problems with blood clots.  The ALJ acknowledged

9   this disorder, stating "The claimant was found to have hypercoagulability related to protein S and

10  protein C deficiency following diagnosis of pulmonary embolisms.  He has been dependent on

11  blood thinner medication (Coumadin)  (Exhibit 5F)."  (CAR 71).  Apparently in relation to this

12  disorder, the ALJ found he suffered from a history of pulmonary embolism.  The ALJ then went

13  on to discuss Plaintiff's "pulmonary function test from December 2006 which revealed normal

14  baseline spirometry without bronchodilator effect."  (CAR 73).  However, the ALJ never

15  discussed Plaintiff's DVT or hypercoagulability, which is the basis for the State agency

16  physician's determination that he cannot sit without moving for risk of blood clots.

17          While a non-examining physician's opinion is given less weight than a treating

18  physician's opinion, here there does not appear to be any other medical opinion given regarding

19  Plaintiff's potential limitation as to sitting.  It appears to the undersigned that Dr. Behravan was

20  Plaintiff's treating physician relating to his workers' compensation injury in his right

21  arm/shoulder, and did not have a significant role in the treatment of his leg or coagulation

22  disorder.  There is no opinion from Dr. Duncan in the record regarding Plaintiff's abilities.

23  Therefore, there is no conflicting opinion and the ALJ should have addressed the condition and

24  the possible limitation.  There is other evidence in the record concerning Plaintiff's claim that he

25  is unable to sit, including Plaintiff's own statements as well as the observations of the agency

26  interviewer who noted Plaintiff had difficulty with sitting and that he appeared to be in pain and

1   constantly moved about in his chair.  (CAR 108).  There is also a significant amount of medical

2   evidence consistent with Plaintiff's blood clotting issue, which should have been addressed as it

3   was raised in his application.  Limiting the issue to a finding of a history of pulmonary embolism

4   in light of the other blood clotting issues was insufficient.  The court will therefore remand this

5   case for further proceedings on this issue.

6                    **D.    PLAINTIFF'S MEDICATIONS**

7               Plaintiff's final claim of error is that the ALJ failed to consider the type, dosage,

8   and side effects of his medications.  He claims the record supports his claim of adverse side

9   effects, such as drowsiness from the methadone, dizziness and fatigue from the Coreg, Altace,

10  Tricor and Nitroquick, and cramps from the Pravachol.  These side effects all contribute to his

11  mental limitations.  However, Plaintiff points to no supportive evidence in the record, nor has the

12  court discovered any indication in the record, with the exception of gaining weight on Lyrica,

13  wherein he made any complaints to his treating and/or examining physicians regarding adverse

14  side effects from his medication.  In fact, notes from Dr. Behravan indicate Plaintiff had no side

15  effects from the medication, and was tolerating it well.  (CAR 353).

16              Plaintiff claims the side effects had a negative impact on his mental condition.  He

17  did report difficulty with concentration and memory to the examining psychologist.  However,

18  the examining psychologist found only slight to moderate impairment related to detailed and

19  complex tasks, and slight impairment on his ability to perform work on a consistent basis,

20  understand and accept instructions from supervisors, and deal with the usual workplace stress.

21  (CAR 551).  In addition, the mental RFC assessment noted only moderate limitations in his

22  ability to understand, remember, and carry out detailed instructions.  No other limitations were

23  noted.  (CAR 565-566).  The slight and moderate limitations noted were noted by the ALJ

24  wherein he found Plaintiff's abilities slightly limited with simple and routine tasks, and a

25  requirement of occasional supervision.  The court finds no error, and that the ALJ's

26  determination was supported by substantial evidence.

## V.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment is granted;

2.      The Commissioner's cross motions for summary judgment is denied;

3.      This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.

DATED: September 27, 2010

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE

31